**Dr. Edward L. SLEEPER, Plaintiff,**

v.

**KIDDER, PEABODY & CO., INC. and
Kidder Peabody Realty Corporation,
Defendants.**

**Civ. A. No. 75–1107–G.**

United States District Court,
D. Massachusetts.

Dec. 6, 1979.

James D. St. Clair, Timothy H. Gailey, Hale & Dorr, Boston, Mass., for plaintiff.

Charles E. Dorkey III, Gandolfo V. DiBlasi of Sullivan & Cromwell, New York City, for defendants.

## MEMORANDUM AND ORDER

GARRITY, District Judge.

The plaintiff purchased a limited partnership interest in a real estate tax shelter whose general partner and promoter was the defendant, Kidder Peabody Realty Corp., a wholly owned subsidiary of Kidder Peabody & Co., Inc. (hereinafter both defendants are referred to as Kidder Peabody, without distinguishing between the two entities). The complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, in connection with the private offering of that investment interest.

Defendants moved for summary judgment on a number of grounds, principal among them that the plaintiff's cause of action is barred by the statute of limitations. A hearing addressed mainly to that issue followed. Based on the arguments of counsel, and the briefs and affidavits submitted in connection with the motion, we grant summary judgment in favor of the defendants.

Kidder Peabody was the exclusive selling agent for the limited partnership, Bunker Hill Redevelopment Company, which sponsored a redevelopment project known as Bunker Hill Towers in downtown Los Angeles, California. In May 1968 the plaintiff, Dr. Edward Sleeper, agreed to invest $100,000 in the Bunker Hill project pursuant to a private placement memorandum dated March 1968 which described the financing and construction of the project, and the possible tax benefits to be derived from the investment. In response to a letter from the defendants dated August 1, 1969, Dr. Sleeper made his final installment of $53,333 towards the purchase price of $100,000. That letter also explained the need for $1.5 million in additional financing which, it was proposed, would come from a second loan to the partnership by Prudential Insurance Co., the first mortgagee on the project.

On November 30, 1970 Kidder Peabody sent to Dr. Sleeper and the other limited partners a letter asking them to make further contributions. The letter explained that revenues from the project had not been enough to offset the operating expenses and it proposed three alternatives for additional investments by the limited partners. The letter included revised projections for the net expenses and taxable income and losses through 1976. On January 15, 1971, Dr. Sleeper made the additional contribution of $16,000.

In January, 1974, Prudential foreclosed on the Bunker Hill project and the partnership was dissolved at a substantial loss to all the limited partners. Dr. Sleeper brought suit in March 1975, citing the 1968 private placement memorandum, the 1969 call for contribution, and the 1970 request for additional financing as the sources of alleged omissions and misrepresentations.

Cases involving a defense based on the statute of limitations often are particularly appropriate for summary judgment. But where the action is one for fraud and where, as here, the plaintiff puts into issue the facts that determine when the statute commences to run, summary judgment may be precluded unless those facts are admitted or established without dispute. *City of Boston v. Hills*, D.Mass.1976, 420 F.Supp. 1291, 1300; *Friedlander v. Feinberg*, S.D.N.Y.1974, 369 F.Supp. 917, 918–19. The burden of showing compliance with the statute of limitations rests with the plaintiff. *Newburgh v. Florsheim Shoe Co.*, D.Mass. 1961, 200 F.Supp. 599, 604. On a motion for summary judgment the court must resolve all doubts concerning the existence of a genuine issue of material fact in favor of the party opposing the motion. *Rogen v. Ilikon Corp.*, 1 Cir., 1966, 361 F.2d 260, 266 n. 6.

In this instance the facts themselves are not in dispute. Nearly identical evidence has been submitted, both in support of and in opposition to defendants' motion. *Cf. Klein v. Bower*, 2 Cir. 1970, 421 F.2d 338, 344. That evidence consists of routine communications by the defendants to the limited partners, relating in detail the declining fortunes of the partnership. At issue then is only the legal significance of these communications: When can it be said that, as a matter of law, Dr. Sleeper knew or should have known from the information supplied to him that the defendants had, as he alleges, misrepresented the investment? At that point the statutory period began to run.

Both parties agree that the applicable limitation period is two years for 10b–5 actions arising on or before January 1, 1974. *Janigan v. Taylor*, 1 Cir., 344 F.2d 781, 783, cert. denied, 1965, 368 U.S. 821, 86 S.Ct. 163, 15 L.Ed.2d 120. The alleged misrepresentations are contained in letters or memoranda dated 1968, 1969 and 1970. Suit was not commenced until March 21, 1975, nearly five years after Dr. Sleeper last invested money in the partnership. Thus, in order to avoid the consequences of this five-year delay, plaintiff must show facts that toll the period of limitation—that it was not until some time after March 21, 1973 that he discovered or, by reasonable diligence, could have discovered the fraud of which he here complains. The plaintiff sets as the earliest date of discovery January 1974, the date Prudential foreclosed on the project. The defendants argue instead that by a continu-

ous stream of disclosure beginning as early as November 1970 with the letter asking for an additional $16,000 contribution, Dr. Sleeper was on notice of the possibility of fraud, and that this action accrued, therefore, at least three to four years before he filed his complaint.

The legal standard to be applied where the plaintiff contends that the limitation period was tolled by his inability to discover the fraud, is well established. The plaintiff may not rely on his own unawareness of the facts or law to toll the statute. *Hupp v. Gray,* 7 Cir. 1974, 500 F.2d 993, 996. He is charged with exercising "reasonable care and diligence in seeking to learn the facts which would disclose fraud." *Morgan v. Koch,* 7 Cir. 1969, 419 F.2d 993, 997. See *Cook v. Avien,* 1 Cir. 1978, 573 F.2d 685, 695; *Klein v. Bower, supra,* 421 F.2d at 343. Once the plaintiff, in the exercise of reasonable diligence, has discovered or should have discovered the fraud, the period of limitation begins to run. *Cook v. Avien, supra,* 573 F.2d at 695.

But what is an easy rule to state is not, in every case, an easy rule to apply. Two cross-cutting issues are here presented. First, from what evidence can we conclude that Dr. Sleeper was sufficiently on notice of the possibility of fraud and thus obliged to make further inquiry? Second, given the presence of sufficient evidence or facts to excite inquiry, by what standard do we judge the reasonableness of Dr. Sleeper's response to those facts and his diligence in undertaking a further investigation?

### Omissions and Disclosures

To answer the first question we must examine the specific misrepresentations and omissions alleged in the complaint.[1] Only three can be said to have been in any sense

material: (1) The defendants omitted to send to Dr. Sleeper a second private placement memorandum, also drafted in 1968, which contained additions and revisions to comply with California law. Most important among those additions was the caveat that the project must be from 86% to 87% rented in order to generate sufficient funds to meet expenses, taxes, and debt service.[2] (DiBlasi Affidavit, Ex. 6, at 9, 22). (2) The offering memorandum and letters that followed failed to describe the investment consequences under market conditions less favorable than those used in the projections. (3) Dr. Sleeper was never informed that the projections had undergone several modifications and were based, in part, on figures supplied by a former general partner who was bought out in 1967 after a history of personal financial difficulties.[3]

Each of the three categories of omissions has a common root: the defendants' failure fully to disclose to Dr. Sleeper the uncertain nature of the projections. Dr. Sleeper argues that he might not have invested had he known that the projections were not hard and fast, that the success of the project depended on a minimum of 86% rentals, and that additional contributions or, if Prudential foreclosed, perhaps dissolution, would be the consequences of failing to meet the projections.

This frames the issue for our ruling on the statute of limitations defense. Do the letters, reports and memoranda received by Dr. Sleeper, taken separately or cumulatively, contain enough information to put him on notice of the errors in the projections and the possibility that the defendants misrepresented the basic terms of the project's success or failure? It is important to make clear the direction our inquiry now takes.

---

**1.** "[A] court must consider, inter alia, the nature of the misleading statement alleged, the opportunity to discover the misleading nature of the statements, and the subsequent actions of the parties." *Cook v. Avien, supra,* 573 F.2d at 696–97.

**2.** The memorandum actually received by Dr. Sleeper had only noted that, assuming 95% rental, operating costs would be met.

**3.** Neither the original nor the amended complaint pleads the particular misrepresentation of failing to disclose the former general partner's early involvement in the project. We are inclined therefore to give it little weight. His role is important, however, in deciding whether the defendants were obliged to make clear the basis for any uncertainty in the projections.

We do not suggest that by later supplying the information omitted in the offering memorandum the defendants somehow mooted any action under 10b–5 for damages arising out of those omissions. We refer to the later disclosures only to decide at what point the limitation period will be deemed to have commenced on that 10b–5 action.

In *Cook v. Avien, supra,* the Court of Appeals described the important "storm warnings" that triggered a reasonable investor's suspicion of fraud. The warnings there consisted largely of financial data, all contained in yearly and quarterly reports, that gave a clear picture of the losses sustained by Avien. Similarly, in *Hoffman v. Estabrook & Co., Inc.,* 1 Cir. 1978, 587 F.2d 509, 519, the evidence was also made up of financial and sales data—data that put the plaintiff on notice that the defendant's continued praise for its product was unfounded. In other cases the evidence that alerted the investor to the possibility of fraud has included returned checks, unproductive wells, petitions for bankruptcy, unsecured borrowing, and the improper accounting of inventory value. *See Johns Hopkins University v. Hutton,* 4 Cir. 1970, 422 F.2d 1124, *reconsidered after remand,* 1973, 488 F.2d 912, *cert. denied* 1974, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118; *Klein v. Bower, supra; Tobacco & Allied Stocks v. Transamerica Corp.,* D.Del.1956, 143 F.Supp. 323, *aff'd,* 3 Cir. 1957, 244 F.2d 902.

These illustrations underscore the important distinction between actual notice and "inquiry" notice. The storm warnings of which *Cook v. Avien* speaks are storm warnings of the possibility of fraud, not of the fraud itself, in all of its detail. *See Klein v. Bower, supra,* 421 F.2d at 343. It is enough that the financial data reveal that things might not be what they were represented to be. In the instant case, in order to set a date for the running of the limitation period, we must find in the defendants' reports to Dr. Sleeper information that shows substantial losses or marked deviations from the projections, and that was made available to Dr. Sleeper under circumstances that would have prompted a diligent investor to make further inquiry.

It is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion.

*Tobacco & Allied Stocks v. Transamerica Corp., supra,* 143 F.Supp. at 331.

The affidavits submitted by both parties in connection with the pending motion present a documentary record of continuous and open disclosure. On August 1, 1969, Kidder Peabody made its final call for partner contributions. (DiBlasi affidavit, exh. 7). This letter, which asked the investors to indicate their preferred source for additional financing, contained the first signs that the initial projections were burdened by unexpected construction costs and changes in design.

Mounting operating and construction costs eventually forced the promoters to seek new financing. Kidder Peabody turned first to the limited partners. By letter dated November 30, 1970, the defendants asked each of the partners to contribute an additional $16,000. The letter described the basis for the $16,000 contribution, the investors' options for refinancing, Prudential's agreement to defer interest on the first mortgage, and projected cash requirements and new leases. The reason for additional financing was clearly identified. The rental income, "even at 95% occupancy", was insufficient to meet projected operating costs and debt service requirements. (DiBlasi affidavit, exh. 8, at 7).

Soon after he made the additional $16,000 contribution, it appears that Dr. Sleeper had begun to question the wisdom of his investment. By the summer of 1971 he was already contemplating selling his interest in

Bunker Hill because "it looked like perhaps foreclosure or sale was eminent [sic]". (Sleeper tr. at 166). In September, 1971 he received from defendants Progress Report No. 11, which advised him that the improvements in operation levels they had projected in their November 1970 letter had not been realized, but that they were hopeful that the project "will be able to pull through without foreclosure." (DiBlasi affidavit, exh. 15, at 2). At the top of the cover letter to the report Dr. Sleeper jotted a note to his accountant, "I picked another winner," implying that he did not share in the defendants' hopes for a turnaround.

Three months later, on December 3, 1971, Dr. Sleeper was notified that once again the interest on the first mortgage would be deferred. (DiBlasi affidavit, exh. 16). The feasibility of refinancing, he was told, was being considered but the defendants doubted a successful plan could be worked out. Because a trustee's sale was the only alternative, the investors were advised, "in view of the very real possibility of foreclosure," to consult their tax counsel or advisors. Handwritten notes at the top of the letter seem to indicate that he did just that.

By the end of 1971 Dr. Sleeper's actions suggest that he already had in mind the consequences of foreclosure. Next to figures contained in a December 23, 1971 letter which explained the mechanics of a trustee's sale, either Dr. Sleeper or his accountant had calculated his 4% share in the resulting gain or loss. In addition, defendants have submitted an exhibit that shows that Dr. Sleeper used foreclosure and nonforeclosure as alternative tax scenarios, in his personal income tax projections for the coming year.

What may have been only a strong suspicion in December of 1971 became a reality eight months later. On August 11, 1972, Prudential, the first mortgagee, issued notice of foreclosure, which notice was duly

reported to the investors in a letter from William Fullarton dated September 21, 1972. (Krantz affidavit, exh. 24). An October letter described progress on a modification agreement between Kidder Peabody and Prudential, but the progress reports thereafter, through the end of 1973, show conditions were steadily worsening. The trustee's sale was held on January 18, 1974.

From this review of Kidder Peabody's considerable correspondence with its investors we conclude that by 1972 any investor should have realized that the project was not what it had been represented to be. The record is replete with new facts and additional disclosures that fill in what was omitted, and set straight what may have been misrepresented in the offering memoranda that are the subject of the plaintiff's complaint. Dr. Sleeper claims, for example, that it was a material omission by the defendants to fail to supply him with the amended offering memorandum which warned investors that the break even point was 85%–86%. Yet in the November 1970 letter the defendants explicitly stated that even if rentals reached 95%, the figure they used for projections in the first offering memorandum, the project would not be able to meet costs.[4] Perhaps Dr. Sleeper did not realize then that the initial projections were inaccurate; but he certainly had good reason to doubt them by September 1971 when Kidder Peabody first mentioned the possibility of foreclosure. And all doubt must have been confirmed by August and September of 1972. By then formal notice of foreclosure had been filed; the collapse of the project was inevitable. Dr. Sleeper had to have been aware not just that the investment had taken a bad turn or that the projections would not readily be met, but that the project was then on the brink of foreclosure after months of declining income and deferred payments on the principal mortgage.

4. Plaintiff argues that it was only in the course of discovery in this action that he discovered the existence of the second memorandum. Thus he could not have known any earlier that the defendants had omitted to state the break even point for the project. In our opinion, to the contrary, the November 1970 letter supplied the omitted information and indeed revised the break even point upward, further exposing the possible misrepresentations in the initial projections.

If the inadequacies of the projections and the omission to state a minimum rental figure are at the heart of the plaintiff's 10b–5 claim, then there is no doubt that the company reports from November 1970 to September 1972 supplied the facts necessary to put Dr. Sleeper on notice that the defendants may have misrepresented the investment. Even waiting until the last reasonable moment to seek legal redress, Dr. Sleeper's cause of action would have accrued by September 1972, and the limitation period would have run by September 1974—a full six months before this suit was filed.

### Reasonableness Standard

Despite Dr. Sleeper's notes to his accountant and the handwritten calculations which suggest that as early as December 1971 he was already planning with the impending foreclosure and collapse of the project in mind, Dr. Sleeper contends that his cause of action did not accrue until January 1974 when the actual foreclosure and winding up took place. This raises the second of the related two issues—given facts sufficient to excite inquiry into the possibility of fraud, by what standard do we judge Dr. Sleeper's response to the facts and his diligence in making further inquiries?

Plaintiff argues that securities defendants, like common law tortfeasors, take the investor as they find him. Accordingly counsel characterizes Dr. Sleeper as an unsophisticated investor with only a rudimentary knowledge of investment matters who often relied on tips and rumors in choosing his investments. This lack of sophistication, counsel argues, explains why plaintiff delayed commencing his action until after the actual sale and distribution of the partnership assets.

The limitation period begins to run whenever the investor, exercising reasonable diligence, could have discovered the fraud on which he brings suit. *See Johns Hopkins University v. Hutton, supra,* 422 F.2d at 1131. Once facts have accumulated that would, in the ordinary investor, excite inquiry into the possibility of fraud, the duty to exercise reasonable diligence in uncovering the fraud is triggered. *Cook v. Avien, supra,* 573 F.2d at 685.

The rule thus has two components. It begins with the ordinary investor—the standard against which we test whether sufficient facts were available at the time to trigger inquiry notice. Once on notice, the investor is then under a duty to exercise due diligence in making a further investigation into those facts. As to the first issue, when inquiry notice is triggered, Dr. Sleeper's level of sophistication is irrelevant. Even if plaintiff here could succeed in carrying his burden of proving no actual notice (which is unlikely in light of his handwritten notes, his testimony, and the ample disclosures of the defendants), any ordinary investor, on the evidence available to him, would have been put on inquiry notice long before March 21, 1973, the outermost date if this action is to be considered timely.

Once on inquiry notice, however, the duty to exercise reasonable diligence in uncovering the fraud may turn in part on the sophistication of the buyer.

> The duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication in the financial community, and knowledge of related proceedings.

*Tobacco & Allied Stocks, supra,* 143 F.Supp. at 331; *see Cook v. Avien, supra,* 573 F.2d at 697.

Considering the extensive and continuous disclosures by the defendants in which they reported on revisions in the initial projections, declining rentals, deferred interest payments, and the ever present possibility of foreclosure by Prudential, plaintiff can hardly argue that the defendants tried somehow to conceal the alleged fraud. And, further considering Dr. Sleeper's record of successes and failures in the market, his understanding of basic investment concepts, the availability of competent tax

counsel, and handwritten notes and calculations that suggest he early anticipated the foreclosure, Dr. Sleeper can hardly plead that it was lack of sophistication that led him to sit idly by until more than a year after the trustee's sale before be brought suit.

Dr. Sleeper's cause of action accrued at the time he could have discovered, by exercising reasonable diligence, the omissions and misrepresentations of which he here complains. On this record, and drawing the most generous inferences for the plaintiff, that time had arrived and passed by September of 1972. Plaintiff's 10b–5 action, which was not filed until March 21, 1975, is barred by the statute of limitations.

### Claims Arising Under State Law

In addition to plaintiff's first three counts which allege violations of the federal securities laws, counts four through six allege the intentional violation, and counts seven through nine the negligent violation, of common law duties of disclosure. We hold that counts four through nine are also barred by the statute of limitations. Accordingly, summary judgment is granted as to the remaining state related claims.

At oral argument counsel addressed their arguments primarily to the federal cause of action. In their memoranda, however, the parties did brief, in passing, the applicable state law on the statute of limitations. The relevant period of limitation is two years, the same as that applied under federal law. Mass. G.L. c. 260, § 2A. The doctrine of fraudulent concealment also applies to toll the running of the statute. Mass. G.L. c. 260, § 12.

In operation, the state law is identical to, if not more stringent than, the federal law we have applied to facts of this case, *ante.* A cause of action based on misrepresentation or deceit generally accrues at the time the alleged misrepresentation is made. *Mansfield v. GAF*, 5 Mass.App. 551, 364 N.E.2d 1292 (1977). Under some circumstances, for example where the facts that would reveal the misrepresentation are "inherently unknowable", the cause of action

may be tolled until plaintiff discovered, or should have discovered the necessary facts. *Friedman v. Jablonki*, 371 Mass. 482, 358 N.E.2d 994 (1976); *see also Hendrikson v. Sears*, 365 Mass. 83, 310 N.E.2d 131 (1974).

The preceding discussion which covered the facts disclosed to Dr. Sleeper and his duty to make reasonable inquiries on those facts applies with equal force to our judgment on the common law counts. On the record presented, by September 1972 plaintiff discovered or should have discovered the fraud of which he now complains.

Plaintiff's action is barred on all counts by the statute of limitations. Summary judgment shall be for the defendant.