Gerald **DOWNEY**, Frederick **Massaro**, **Howard Slater, Louis Steinhardt, Ernest Caggiano, Kenneth Sacco, and Paul Calvani, on behalf of themselves and all similarly situated persons, Plaintiffs,**

v.

**VERNITRON CORP., Benjamin Sachs, Bernard E. Levine, and Herman Nathanson, Defendants.**

Civ. A. No. 81–1916–S.

United States District Court,
D. Massachusetts.

March 9, 1982.

Edward T. Dangel, III, Dangel & Sherry, Boston, Mass., for plaintiffs.

Edwin A. McCabe, Widett, Slater & Goldman, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

SKINNER, District Judge.

Plaintiffs bring this class action to challenge actions by defendants which allegedly wrongfully inflated the value of defendant Vernitron Corporation's ("Vernitron") stock in violation of §§ 10(b) and 23 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78w, Rule 10b–5, 17 C.F.R. 240.-106–5, and which constituted gross mismanagement of the corporation. Plaintiffs are shareholders in Vernitron, or were so during the period in question. The individual defendants are officers of Vernitron. Jurisdiction is based upon diversity of citizenship and the existence of a federal question.

Defendants have now moved to dismiss plaintiffs' complaint, or in the alternative

for summary judgment. For the reasons which follow, defendants' motion is allowed in part and denied in part.

Plaintiffs' claims arise out of two separate series of events. The first involved the manipulation of the price of Vernitron stock by Leonard Smith, an employee of Bateman, Eichler, Hill, Richards, Inc. ("Bateman Eichler") a securities brokerage firm. Between January, 1977, and late July, 1977, Smith engaged in a series of unauthorized purchases of Vernitron shares designed to inflate their market price. The SEC suspended trading in Vernitron stock in July, 1977, and instituted actions against Smith and Bateman Eichler.[1] In 1979, a class action on behalf of individuals who purchased or sold Vernitron shares between January and July, 1977, was commenced against Smith and Bateman Eichler. The class action resulted in a recovery of 40% of the class members' losses. In none of these actions were the defendants in this case charged with any wrongdoing.

Plaintiffs now contend that new information has come to light which links defendants with Smith's manipulative activities. In Count I of the complaint they allege that defendants knowingly took part in the manipulation in violation of § 10(b) and Rule 10b–5. They seek to recover all losses not paid by Bateman Eichler.

The second series of events involved Vernitron's unsuccessful attempt to develop and market piezoelectric igniters for use in kitchen stoves and ranges.[2] In the early 1970's, Vernitron acquired the capability to produce and market the igniters in the United States. The company's plan was to replace energy-wasting pilot lights with piezoelectric igniters on a wide range of gas appliances. Its greatest potential profits, however, appeared to lie in the igniter's use in kitchen appliances. A well publicized effort was soon begun to convince manufacturers of stoves and ranges to switch from pilot lights to piezoelectric igniters, as well as to convince potential stockholders that the igniters made Vernitron stock a very good investment.

Vernitron's efforts to market the igniters were impeded, however, by the American Gas Association's ("AGA") opposition to their use in kitchen appliances. Without approval by the AGA, manufacturers were unwilling to use the igniters. Vernitron attempted to convince the AGA to change its position, but met with little success. In October, 1978, after investigating, publicizing, and then abandoning the possibility of retrofitting igniters onto existing stoves and ranges, the company decided to terminate its efforts to develop the igniters for use in kitchen appliances.

Plaintiffs contend that throughout this period defendants made misleadingly optimistic statements about the success of their efforts to market the igniter and, in 1978, failed to disclose their decision to abandon its development for use in kitchen appliances. In Count II of the complaint, they allege that these misrepresentations and failures to disclose violated § 10(b) and Rule 10b–5 and seek to recover all of the losses they incurred by reason of defendants' actions.

In Count III, plaintiffs combine defendants' actions with respect to the manipulation of their stock and the promotion of the piezoelectric igniter into one cause of action. They allege that defendants' failure to prevent or inform stockholders of the manipulation of their stock, the failure to properly inform the public about the piezoelectric igniter, and the failure to take the proper steps to successfully develop the igniter constitute gross mismanagement of the corporation which has diminished the value of their shares.

Defendants have moved to dismiss plaintiffs' complaint for lack of standing, failure to state a claim, and failure to comply with the statute of limitations. In the alternative, defendants have moved for summary judgment on all counts.

---

1. Bateman Eichler eventually entered into a consent decree with the SEC and Smith pled guilty to two counts of violating Rule 10b–5.

2. "Piezoelectric igniters" use an electrical spark to light gas appliances, rather than a pilot light.

## I. *Standing.*

Defendants contend that plaintiffs' claims under § 10(b) and Rule 10b–5 should be dismissed because plaintiffs have failed to allege that they were purchasers or sellers of stock during the periods in question.

On March 3, 1981, after defendants' motion had been made, plaintiffs amended their complaint as of right. The amended complaint states that the named plaintiffs purchased or sold Vernitron shares during 1977 and 1978, and were injured by defendants' violations. This is sufficient to establish their standing to bring an action under § 10(b) or Rule 10b–5. *See, Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 749, 95 S.Ct. 1917, 1922–23, 1931–32, 44 L.Ed.2d 539 (1975).

Accordingly, defendants' motion to dismiss Counts I and II for lack of standing is DENIED.

## II. *Failure to State A Claim.*

### A. *Count I.*

Defendants argue that plaintiffs have not stated a claim under § 10(b) or Rule 10b–5 in Count I, because they have failed to allege scienter.

■ In order to state a claim under § 10(b) or Rule 10b–5, plaintiffs must allege that defendants acted with "intent to deceive, manipulate, or defraud". *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–194 n. 12, 96 S.Ct. 1375, 1381–82 n. 12, 47 L.Ed.2d 668 (1976). While allegedly reckless conduct may meet the scienter requirement, *id., Cook v. Avien, Inc.,* 573 F.2d 685, 692 (1st Cir.1978), negligent conduct will not. *Ernst,* 425 U.S. at 193, 96 S.Ct. at 1380–81.

■ In Count I, plaintiffs allege that "defendants *knowingly cooperated in,* allowed to occur, and failed to prevent" the stock manipulation by Bateman Eichler. (emphasis supplied). Combined with the allegations that defendants were aware of Smith's trading activities and received written confirmations of his transactions in Vernitron stock, the allegation of "knowing

cooperation" is sufficient to meet the requirement of alleging an "intent to manipulate" in *Ernst.* As a result, plaintiffs have stated a claim under § 10(b) and Rule 10b–5.

Accordingly, defendants' motion to dismiss Count I for failure to state a claim is DENIED.

### B. *Count II.*

Defendants contend that Count II fails to state a claim under § 10(b) or Rule 10b–5 because their statements concerning the development of the piezoelectric igniters were justified expressions of hope and therefore not actionable, *citing, Dolgow v. Anderson,* 53 F.R.D. 664 (E.D.N.Y.1971), *aff'd* 464 F.2d 437 (2nd Cir.1972).

■ On a motion to dismiss, plaintiffs' allegations are to be taken as true. Wright and Miller, *Federal Practice and Procedure* § 1357, p. 594. In this case, plaintiffs have alleged that defendants intentionally misled investors as to the state of the igniters' development and intentionally failed to disclose Vernitron's decision to discontinue its attempt to bring piezoelectricity into the kitchen. This is sufficient to state a cause of action under § 10(b) and Rule 10b–5. *See, for example, Hoffman v. Estabrook & Co., Inc.,* 587 F.2d 509, 513–515 (1st Cir. 1978) (violations of § 10(b) and Rule 10B–5 found where defendants misrepresented the production stage of their products).

Accordingly, defendants' motion to dismiss Count II for failure to state a claim is DENIED.

### C. *Count III.*

Defendants argue that plaintiffs have not stated a claim in Count III for two reasons: (1) a claim for gross mismanagement of a corporation is not actionable under § 10(b) or Rule 10b–5; and (2) if plaintiffs are alleging a violation of state corporate law, the action has to be brought as a derivative suit.

#### 1. *§ 10(b).*

■ As a general rule, claims of corporate mismanagement or breaches of fiduci-

ary duties are not actionable under § 10(b) or Rule 10b–5. *Superintendent of Insurance v. Banker's Life and Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), *Drachman v. Harvey,* 453 F.2d 722, 731 (2nd Cir.1972). Where the mismanagement or breach can be viewed as "manipulative or deceptive" within the meaning of the Act, however, a claim under § 10(b) may be stated. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473–474, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977), *Goldberg v. Meridor,* 567 F.2d 209, 221 (2nd Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1977).

No such claim has been stated in Count III. Plaintiffs allege that: (1) "the actions of the defendants in failing to prevent, and to inform stockholders of, the manipulation of Vernitron stock by Len Smith"; (2) "the failure of the defendants to inform the public properly concerning the piezoelectric device"; (3) "the failure of the defendants to actively seek AGA approval"; (4) "the failure of the defendants to develop, manufacture and market the piezoelectric device for retrofit use on gas kitchen stoves and ranges"; (5) "the failure of the defendants to keep necessary patents in force"; (6) "and the failure of the defendants to inform stockholders of all these actions and failures to act", have caused the stockholders' shares to diminish in value and fail to reach their proper value. To the extent that portions of Count III allege intentional failure to inform the public about the manipulation or the success of the igniters, the claims are the same as those in Counts I and II. To the extent a negligent failure to inform is alleged, it is insufficient to state a claim under § 10(b) or Rule 10b–5. *Ernst,* 425 U.S. at 193–194 n. 12, 96 S.Ct. at 1381 n. 12. To the extent that pure mismanagement of the corporation is alleged, it is not actionable under § 10(b) or Rule 10b–5. *Superintendent of Insurance,* 404 U.S. at 12, 92 S.Ct. at 169. Therefore, if Count III is to proceed, it must be as a claim under state law.

### 2. *State Cause of Action.*

■ Defendants argue that as a state law action for corporate mismanagement,

Count III has to be brought as a derivative suit. Since plaintiffs have brought the suit directly, defendants maintain that it must be dismissed.

■ The law to be applied on this claim is determined by reference to Massachusetts law. *See, Shore v. Cornell-Dubilier Electric Corp.,* 33 F.R.D. 5, 6 (D.Mass. 1963). Massachusetts law requires that a court look to the law of the state of the company's incorporation in order to determine the corporation's liability to its stockholders or creditors. *Beacon Wool Corp. v. Johnson,* 331 Mass. 274, 279, 119 N.E.2d 195 (1954); Rest.2d Conflict of Laws § 309. While there is some disagreement between the parties on whether Vernitron's state of incorporation is New York or Delaware, the result is the same in each: suits challenging alleged corporate mismanagement must be brought as derivative actions. *Bokat v. Getty Oil Co.,* 262 A.2d 246 (Del.1970), *In re Baldwin Trading Corp.,* 8 N.Y.2d 144, 202 N.Y.S.2d 312, 168 N.E.2d 383 (1960), *Gordon v. Elliman,* 306 N.Y. 456, 119 N.E.2d 331 (1954).

■ Plaintiffs seek to avoid this requirement by arguing that the special circumstances of this case authorize the bringing of a direct suit. First, they contend that since the individual defendants here are also large shareholders in Vernitron, any corporate recovery would only be funneled back to those defendants through their status as stockholders. This concern has been raised in a number of cases. It is addressed by decreeing a pro rata recovery in the derivative suit, not by changing the nature of the suit. *See, Schur v. Salzman,* 50 App.Div.2d 784, 377 N.Y.S.2d 82 (1975), *Samia v. Central Oil Co.,* 339 Mass. 101, 158 N.E.2d 469 (1969).

■ Second, plaintiffs argue that they were forced to sell their shares at less than their true value because of defendants' actions and can bring a direct suit to recover their losses. The cases cited by plaintiffs in support of this position, however, involved plaintiffs who had sold all of their stock in

the corporation and therefore had no standing to bring a derivative suit or share in the proceeds of one. *See, Kirk v. First National Bank of Columbus,* 439 F.Supp. 1141, 1148–1149 (M.D.Ga.1977), *Watson v. Button,* 235 F.2d 235, 237 (9th Cir.1956), *Von Au v. Magenheimer,* 126 App.Div. 257, 110 N.Y.S. 629, *aff'd* 196 N.Y. 510, 89 N.E. 1114 (1909).

In this case, plaintiffs have not alleged that they have sold all of their shares in Vernitron and thus have no standing to bring a derivative suit. Since there are no other grounds upon which to base an exception to the general rule requiring a derivative suit in this case,[3] plaintiffs cannot maintain their direct suit for corporate mismanagement. Even if plaintiffs were to amend their complaint to allege that they have sold all their Vernitron stock, several other factors would have to be considered before allowing a direct action to proceed, including: prejudice to creditors, multiplicity of suits, and diminution of Vernitron's assets. *See, Kirk v. First Nat'l Bank of Columbus,* 439 F.Supp. at 1149.

Accordingly, Count III of plaintiff's complaint is DISMISSED.

### III. *Statute of Limitations.*

Defendants' next argument is that Count I should be dismissed for failure to comply with the statute of limitations. In support of this position, they point to the fact that while the manipulation complained of took place between January and July, 1977, this suit was not filed until July, 1981, four years later and well beyond the three-year limitation period.

No limitation period is provided for in § 10(b). In order to determine the proper period, courts look to the statutory period for the "analogous cause of action under state law". *Cook v. Avien,* 573 F.2d at 694. In this case, that period is three years. *Id.* n. 20. While state law is used to determine the length of the statutory period, federal law determines when the period begins to run. *Id., Janigan v. Taylor,* 344 F.2d 781, 784 (1st Cir.1965), *cert. denied,* 382 U.S. 879, 86 S.Ct. 164, 15 L.Ed.2d 120 (1965). In actions under § 10(b) or Rule 10b–5, the cause of action accrues and the statute begins to run "at the time when plaintiff in the exercise of reasonable diligence discovered or should have discovered the fraud of which he complains."[4] *Cook v. Avien,* 573 F.2d at 695. The duty to exercise reasonable diligence is triggered by events which should lead plaintiff to suspect the existence of fraud ("inquiry notice"). *Id.* at 696. Inquiry notice can be established by a sharp drop in the price of a security, *see, Hupp v. Gray,* 500 F.2d 993, 996 (7th Cir.1974), by the suspension of trading in the stock by the SEC, *see, Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402 (2nd Cir.1975), or by similar events which indicate that things are not as they were represented to be. *See, Sleeper v. Kidder, Peabody & Co., Inc.,* 480 F.Supp. 1264, 1270 (D.Mass.1979), *aff'd* 627 F.2d 1088 (1st Cir.1980). Whether plaintiff then fulfilled his duty of reasonable diligence depends upon a number of factors, including: the nature of the fraud alleged, the opportunity to discover the

**3.** Plaintiffs also argue that Count III alleges a direct and personal wrong to them and therefore a derivative suit is not required. The only possible direct injuries alleged by plaintiffs in Count III are losses from defendants' alleged failure to disclose material information. *See, Coronado Development Corp. v. Milliken,* 175 Misc. 1, 22 N.Y.S.2d 670, 675 (Sup.Ct.1940). Those allegations are addressed in Counts I and II; what remains in Count III are wrongs against the corporation.

**4.** Some circuits hold that another rule applies where defendants have actively concealed the fraud. In such a case, the statute does not begin to run until actual discovery of the fraud by plaintiff, regardless of whether he exercised

reasonable diligence. *Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2nd Cir.1979), *Tomera v. Galt,* 511 F.2d 504 (7th Cir.1975), *but see State of Ohio v. Peterson, Lowry, Rall, etc.,* 651 F.2d 687, 694–695 n. 16 (10th Cir.1981) ("[W]e see no reason why an act of concealment by defendant should excuse plaintiff from his obligation of diligence.... We hold, therefore, that there is but one federal doctrine of equitable tolling ..."). The existence of this separate standard has yet to be decided in this circuit. Because of my holding with respect to plaintiffs' reasonable diligence, however, it is unnecessary to consider its application at this point in the case.

fraud, and the subsequent actions of the parties. *Cook v. Avien,* 573 F.2d at 696–697. It is a decision based on the facts of each case. *Id.* As a result, unless the facts "are admitted or established without dispute", *Sleeper v. Kidder, Peabody & Co., Inc.,* 480 F.Supp. at 1265, it is an issue best left for trial. *Id., Cook v. Avien,* 573 F.2d at 697 and n. 27.

■ In this case, a substantial controversy exists as to whether plaintiffs should have discovered the alleged fraud of defendants before July, 1978, three years before the filing of this action. Plaintiffs maintain that they exercised reasonable diligence and were still not able to discover defendants' alleged cooperation in the manipulation of Vernitron stock until Smith's deposition was taken in early 1981. They admit that they were aware of the manipulation by Smith and Bateman Eichler in July, 1977. They contend, however, that that knowledge is insufficient to charge them with knowledge about defendants' alleged role. Soon after Smith's activities were disclosed by the SEC, plaintiffs contacted defendants inquiring about their knowledge of the manipulation. Defendants assured them at that time, at several later times, and in several filings with the SEC, that they had no knowledge of Smith's and Bateman Eichler's illegal trading. Plaintiffs also took an active part in several suits against Smith and Bateman Eichler, none of which charged defendants here with any wrongdoing. It was only in connection with discovery in a later case against these defendants on another matter that plaintiffs uncovered evidence allegedly establishing defendants' participation in the manipulation. In addition, plaintiffs were aware that the SEC, after investigating the incident, only instituted actions against Smith and Bateman Eichler, not against the defendants here. Plaintiffs argue that these efforts were sufficient to constitute reasonable diligence and toll the running of the statute until early 1981, when they allegedly uncovered the fraud.

Defendants take the opposite view. They maintain that since the manipulation took place during the first half of 1977 and since it was conducted by the same broker that Vernitron used to make purchases for its employee stock plan, any participation by Vernitron in illegal manipulations should have been discovered well before March, 1981. In addition, they argue that Smith was available for deposition well before March, 1981, and that anything that plaintiffs discovered in his deposition was or should have been known to them in the summer of 1977.

■ It is true that plaintiffs need not know the full details of the alleged fraud in order to begin the running of the statutory period. *See, Klein v. Shields & Co.,* 470 F.2d 1344, 1347 (2nd Cir.1972). I think that a genuine issue of fact exists, however, as to whether plaintiffs should have known of defendants' alleged fraud before July, 1978. Although the sudden drop in the price of the stock, the SEC investigation, and the suits filed certainly put plaintiffs on notice as to the illegal activities of Smith and Bateman Eichler, conflicting inferences could be drawn from those facts as to the participation of these defendants in the manipulation. *See, Robertson v. Seidman & Seidman,* 602 F.2d 583, 591–592 (2nd Cir. 1979) (summary judgment inappropriate on limitations question because conflicting inferences can be drawn from the facts putting plaintiff on notice about the illegal activities of the marketmakers and underwriters as to the role of the defendant accounting firm in alleged § 10(b) and Rule 10b–5 violations). This is especially true given the existence of the SEC investigation and the lack of any action having been taken against defendants as a result of that investigation. *See, id.* at 592 ("If the SEC . . . was unable to discover the complicity of these accountants until . . . September 1, 1976 . . ., it cannot be said as a matter of law that [plaintiff] should have discovered their participation any earlier".) While plaintiffs might well have been able to obtain more information about defendants' alleged activities from Smith at an earlier date, I do not think that this is sufficient to establish that they should have known of

defendants' alleged fraud before July, 1978. Doubts as to "the existence of a genuine issue of material fact" are to be resolved "in favor of the party opposing the motion [for summary judgment]". *Sleeper v. Kidder, Peabody & Co., Inc.,* 480 F.Supp. at 1265.

Since a genuine issue of material fact exists, summary judgment on the issue of statute of limitations is inappropriate. Accordingly, the matter will be left for determination at trial and defendants' motion is DENIED.

### IV. *Merits.*

Defendants' final contention is that they are entitled to summary judgment as a matter of law on the merits of all three counts.

I do not think that consideration of such a motion is appropriate at this stage of the case. Plaintiff contests many of the facts claimed by defendants and has not yet completed discovery. Given this case's procedural posture, defendants' motion is premature.

Accordingly, defendants' motion for summary judgment is DENIED without prejudice.