Allan H. KRAVETZ and Jason C. Kravetz, Plaintiffs,

v.

UNITED STATES TRUST COMPANY, UST Investment Advisors, Inc., UST Merchant Bancorp, Inc., Stephen R. Lewinstein, and Stephen N. Wilchins, Defendants.

C.A. No. 92–10388–MLW.

United States District Court, D. Massachusetts.

Sept. 7, 1996.

---

Stephen F. Gordon, Gordon & Wise, Boston, MA, for Plaintiffs.

John A. Wortmann, Jr., James W. Stoll, Brown, Rudnick, Freed & Gesmer, Boston, MA, Edward A. Sokoloff, UST Corp., Boston, MA, for defendants.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

Plaintiffs Allan and Jason Kravetz (the "Kravetzes") brought this action on February 14, 1992 alleging that their investment advisors had fraudulently induced them to purchase various limited partnership inter-

ests which were not consistent with their stated investment objectives. In their amended complaint (the "Amended Complaint"), plaintiffs seek to recover damages for breach of contract, breach of fiduciary duty, violations of state and federal securities laws, deceit, and unfair trade practices under M.G.L. ch. 93A. After the dismissal of certain claims from the case, and after limited discovery, the defendants in this action, United States Trust Company, UST Investment Advisors, Inc., UST Merchant Bancorp., Inc., Stephen R. Lewinstein, and Stephen N. Wilchins, filed a motion for summary judgment on June 25, 1996 with respect to the remaining claims. The defendants assert that the plaintiffs' remaining claims, as they relate to nine out of the ten limited partnership investments, are barred by the applicable statutes of limitations. In their reply brief in support of summary judgment, the defendants also request dismissal of the plaintiffs' remaining claims on the basis that the plaintiffs have committed a fraud on the court.

For the reasons stated below, the defendants' request for dismissal based on fraud on the court is being denied; defendants' motion for summary judgment on the plaintiffs' deceit and breach of fiduciary duty claims (Counts IV and V) is being allowed; and defendants' motion for summary judgment on the plaintiffs' breach of contract claim (Count I) is being allowed in part and denied in part.

## I. PROCEDURAL HISTORY

On October 18, 1995, the court dismissed the original complaint in this case for failure to plead fraud with particularity as required by Fed.R.Civ.P. 9(b). *See* October 18, 1995 Order, ¶ 4. The court granted the plaintiffs leave to amend their complaint to satisfy the requirements of Rule 9(b). On October 18, 1995, the court also ruled that the plaintiffs, in amending their complaint, were barred from asserting any violations of M.G.L. ch. 93A relating to securities purchased prior to April 4, 1988 because the statute did not apply to the sale of securities prior to that date. *Id.*, ¶ 7; *see Shamsi v. Dean Witter*

*Reynolds, Inc.,* 743 F.Supp. 87, 93 (D.Mass. 1989).

On December 4, 1995, plaintiffs amended their complaint. The Amended Complaint includes six counts. Count I asserts a claim for breach of contract. Count II asserts a claim under the Securities Exchange Act of 1934 § 10(b). Count III asserts a claim under the Massachusetts Blue Sky Act, M.G.L. ch. 100A § 410. Count IV asserts a claim for deceit. Count V asserts a claim for breach of fiduciary duty. Count VI asserts a claim under M.G.L. ch. 93A §§ 2, 9. By stipulation, the parties agreed that Count VI applies only to Allan Kravetz's March 1989 investment in Groton Development Associates Limited Partnership ("Groton"). *See* Docket # 43.

On December 29, 1995, defendants moved to dismiss the Amended Complaint. On February 21, 1996, the court dismissed Counts II and III of the Amended Complaint because these claims were time-barred. *See* February 21, 1996 Order, ¶¶ 1 and 2. The court denied the defendants' motion to dismiss Counts I, IV, V, and VI of the Amended Complaint. Pursuant to its February 21, 1996 Order, the court allowed the parties to engage in limited discovery on "the question of whether plaintiffs' [remaining] claims are barred on statute of limitations grounds." *Id.*, p. 2. The defendants have filed a motion for summary judgment on this limited issue. In this motion, the defendants concede that any claims relating to Allan Kravetz's investment in Groton are not time-barred because this investment was made within three years of the filing of the original complaint.

## II. FACTS

Except as indicated, the following facts are not in dispute.

### A. *The Kravetzes Retain the Services of the Bank*

In 1983, the Kravetzes sold certain real property located at 131 Clarendon Street in Boston, Massachusetts for approximately $4,000,000. In 1984, the Kravetzes met with several employees of the United States Trust

Company (the "Bank")[1] and discussed the possibility of obtaining advice and services from the Bank with regard to the investment of a portion of the proceeds from the real estate sale. The plaintiffs first met with Bank president James Sidell. The plaintiffs allegedly informed Sidell that the proceeds from the real estate sale represented the overwhelming majority of their assets, that they never expected to receive such a windfall again, and that they hoped to live off the sale proceeds for the rest of their lives. Affidavit of Allan Kravetz, July 19, 1996 ("Aff. of Allan Kravetz"), ¶ 9; Affidavit of Jason Kravetz, July 19, 1996 ("Aff. of Jason Kravetz"), ¶ 8. The plaintiffs also allegedly informed Sidell that they sought tax-free investments. *Id.* After their meeting with Sidell, the Kravetzes met with Domenic Colasacco and then with Stephen Lewinstein. At both meetings, the Kravetzes allegedly reiterated the investment objectives which they had previously described to Sidell and also indicated that "they did not want to do anything that would put that money at risk." Aff. of Allan Kravetz, ¶¶ 11, 14; Aff. of Jason Kravetz, ¶¶ 10, 13.

In 1984, the Kravetzes agreed to employ the investment advisory services of the Bank. The Kravetzes' account was placed under the primary control of Lewinstein and his associate, Stephen Wilchins. In May 1984, Allan and Jason Kravetz each signed an "Investment Advisory Agreement" (the "Agreement") in which they agreed to pay the Bank $5,000 for rendering certain advisory services. Through 1988, the Kravetzes signed such an agreement on an annual basis. The May 1984 version of the Agreement provided, *inter alia,* that:

> USTIA will perform the following services for the Client: (a) seek out, research and evaluate, and recommend for purchase, investment opportunities which it deems appropriate for Client's needs and objectives in the areas of real estate, oil and gas, equipment leasing, research and development, cable television and other areas of interest.

*See* Aff. of Allan Kravetz, Ex. A; Aff. of Jason Kravetz, Ex. A. The May 1984 version of the Agreement further provided that: "USTIA will have no liability to Client hereunder in the absence of bad faith, gross negligence or reckless disregard of its obligations or duties hereunder." *Id.*

In January 1987, the Bank altered certain terms of the Agreement. As a result, the Agreements signed by the Kravetzes in 1987 and 1988 did not have the provision limiting liability in the absence of bad faith, gross negligence, or reckless disregard which was in the prior Agreements. *See* Appendix to Defendants' Memorandum in Support of Summary Judgment ("Appendix"), Vol. I, p. 201. The 1987 version of the Agreement maintained, in slightly edited form, USTIA's promise to "seek out, evaluate, and recommend for purchase, real estate and other investment opportunities which it deems appropriate for Client's needs and objectives." *Id.* at 200.

## B. *The Purchase of Limited Partnership Interests*

Between September 1984 and March 1989, upon the recommendation of Lewinstein and Wilchins, the Kravetzes purchased interests in ten real estate limited partnerships. In September 1984, the Kravetzes invested in the Clinton Shopping Center Associates Limited Partnership ("Clinton"). In November 1984, the Kravetzes invested in the Old Mews Limited Partnership ("Old Mews"). In March 1985, the Kravetzes invested in the Honeytree Limited Partnership ("Honeytree"). In June 1986, the Kravetzes invested in the Gratz Park Associates Limited Partnership ("Gratz Park"). In May 1987, the Kravetzes invested in Braden Lakes Associates, Ltd. ("Braden Lakes") and in the Forest Mortgage Company Limited Partnership ("Forest Mortgage"). In September and October 1987, the Kravetzes invested in the Petron Mortgage Company Limited Partnership ("Petron Mortgage"). In February 1988, the Kravetzes invested in the Chattanooga Properties–I Limited Partnership

---

1. Defendants UST Investment Advisors, Inc. ("USTIA") and UST Merchant Bancorp, Inc. ("USTMB") are subsidiaries of the Bank.

("Chattanooga") and in The Hamptons Associates Ltd ("The Hamptons"). Finally, in March 1989, Allan Kravetz invested in Groton.

In their affidavits submitted in connection with the plaintiffs' opposition to summary judgment, the Kravetzes each state that:

> My purchase of the investments recommended by Mr. Lewinstein and his associate, Steven Wilchins, followed substantially the same pattern. Either Mr. Lewinstein or Mr. Wilchins would telephone me to discuss the investment. In each case, they told me substantially the same thing, namely that they had reviewed hundreds of investment opportunities and that they were recommending this particular investment as consistent with my investment objectives. In each case, they also told me that the investment was "tax free." Because I was relying on Mr. Lewinstein and Mr. Wilchins' superior knowledge and expertise and because I placed my complete trust, faith and confidence in Mr. Lewinstein and Mr. Wilchins, I purchased every single investment which they recommended to me between 1984 and 1988.

Aff. of Allan Kravetz, ¶ 18; Aff. of Jason Kravetz, ¶ 17. In their previous depositions, the Kravetzes could not recall any specific statements made by Lewinstein or Wilchins with regard to any of the investments (excluding Groton) except that they were told by Lewinstein and Wilchins that the investments were "good" or "excellent". *See* Appendix, Vol. II, Deposition of Allan Kravetz, pp. 71–72, 74, Deposition of Jason Kravetz, pp. 24–25.

## C. The Offering Memoranda

According to Lewinstein, "[i]t was the standard practice of USTIA to provide all perspective [sic] investors with written materials regarding their investments prior to the investment being made. In most instances these materials included introductory letters prepared by USTIA as well as the private placement memoranda, subscription documents, and investment summaries." Affidavit of Stephen Lewinstein, Appendix, Vol. I, p. 230. In the present case, the Kravetzes do not dispute the Bank's contention that they sent such investment materials to the Kravetzes. Nor do the Kravetzes deny receiving such documents.[2]

The offering memoranda for the limited partnerships, which were provided to the Kravetzes, contained certain cautionary language. For example, the Clinton offering memorandum states: "THE INVESTMENT DESCRIBED HEREIN INVOLVES A HIGH DEGREE OF RISK.... THE PURCHASE OF UNITS IN THE PARTNERSHIP MUST BE CONSIDERED SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK." Appendix, Vol. I, p. 2.[3] The Old Mews offering memorandum states, "PURCHASE OF THESE SECURITIES INVOLVES A HIGH DEGREE OF RISK, WHICH COULD JEOPARDIZE THE INVESTORS' INVESTMENT IN THE PARTNERSHIP AND COULD REDUCE OR ELIMINATE THE ANTICIPATED TAX AND OTHER BENEFITS OF SUCH INVESTMENT." *Id.* at 3. The Old Mews memorandum also states that "[t]here are material income tax risks associated with the Offering." *Id.* With the ex-

---

**2.** Pursuant to the defendants' request for production, Allan Kravetz produced "complete copies of the private placement memoranda" for eight of the ten investments. *See* Appendix, Vol. II, Affidavit of John A. Wortmann, ¶ 5. In his affidavit, Jason Kravetz acknowledges that, "in connection with these investments, the bank would from time to time send documents to me." Aff. of Jason Kravetz, ¶ 18. In the subscription agreements for Gratz Park and Old Mews, which Jason Kravetz signed, he certified that he had received offering memoranda for these investments. Jason Kravetz testified that, at some point, the Bank complied with his request to stop sending investment materials to him and to send the materials to his accountant, Michael

Tulman. *See* Appendix, Vol. II, Deposition of Jason Kravetz, p. 46. During discovery, Mr. Tulman's office produced materials relating to Braden Lakes, Chattanooga, Hamptons, and Groton. *See* Appendix, Vol. II, Affidavit of John A. Wortmann, ¶ 11.

**3.** In their exhibits submitted in connection with summary judgment, the defendants provided the court with a Fed.R.Evid. 1006 summary of the relevant offering memoranda. *See* Appendix, Vol. I, pp. 1–13. The underlying documentation for this Rule 1006 summary was provided to the court in connection with the defendants' motion to dismiss the Amended Complaint.

ception of the Honeytree investment, all of the offering memoranda contained express "high risk" language.[4] In addition, the offering memoranda for Old Mews, Gratz Park, Forrest Mortgage, Braden Lakes, Petron Mortgage, Chattanooga, and Groton contained tax warnings or disclaimers.

Allan and Jason Kravetz each represent that they "did not read" the investment materials, including the offering memoranda, which were sent to them. Aff. of Allan Kravetz, ¶ 19; Aff. of Jason Kravetz, ¶ 18. However, with respect to the Braden Lakes investment, each of the Kravetzes signed a subscription agreement which certified that he "ha[d] received the [private placement] Memorandum and the Braden Lakes Associates, Ltd. Brochure and ha[d] read the Partnership Agreement, the Memorandum and the Braden Lakes Associates, Ltd. Brochure, and ha[d] relied on the information contained therein ...." Appendix, Vol. I, pp. 31, 51. Similarly, Allan Kravetz certified that he had "READ CAREFULLY AND UNDERSTANDS THE [offering] MEMORANDUM" relating to Honeytree. *Id.* at 105. Jason Kravetz certified that he had "read carefully, or has reviewed with his Purchaser Representative, the [private placement] Memorandum" relating to Old Mews. Jason Kravetz also certified that he had "carefully read and understood the [offering] Memorandum (including the 'Risk Factors' set forth therein) ..." for Gratz Park. *Id.* at 80. The Kravetzes represent that they did not read any of these subscription documents which they signed. Aff. of Allan Kravetz, ¶ 20; Aff. of Jason Kravetz, ¶ 19.

### D. *The Kravetzes' Financial and Investment Background*

In their affidavits, the Kravetzes make various representations concerning their financial sophistication and investment experience. In his affidavit submitted in connection with the plaintiffs' opposition to the motion to dismiss the original complaint, Jason Kravetz states that, "I have absolutely no experience or education in the area of finance or investments." Aff. of Jason Kravetz, Docket # 17, p. 2. In his affidavit submitted for the same purpose, Allan Kravetz states that "I have no training or education in financial matters." Aff. of Allan Kravetz, Docket # 16, p. 2. In their affidavits submitted in connection with the defendants' motion for summary judgment, the Kravetzes each represent that "[a]t the time I signed the contract, I did not consider myself an experienced or sophisticated investor ... I only had purchased a small number of securities through brokers and a small number of condominiums." Aff. of Jason Kravetz, ¶ 15; Aff. of Allan Kravetz, ¶ 16.

The defendants dispute the validity of these statements by pointing to the following investment histories. Allan Kravetz certified in a Gratz Park investor questionnaire that he "often" invested in marketable securities, "occasionally" invested in unmarketable securities, and that his "businesses" were "[b]usiness owner and real estate investing." Appendix, Vol. I, pp. 72–73. In his deposition, Allan Kravetz testified that he had invested $200,000 with Carmen Elio in the "mid '70s, early '80s". Appendix, Vol. II, Deposition. of Allan Kravetz, p. 84. Allan Kravetz also testified that he has a "portfolio at Paine-Webber", which he started in the "late '70s or early '80s," worth "about $400,000". *Id.* at 87. In addition, Allan Kravetz held a John Hancock real estate limited partnership interest, and had purchased and sold condominiums in Florida and Massachusetts. *Id.* at 89, 106–110.

Jason Kravetz received a B.S. degree in Business Administration from Northeastern University in 1971. Appendix, Vol. II, p. 405. In his application for the Old Mews investment, Jason Kravetz certified that, from 1974–84, he had invested $250,000 in "real estate", "oil & gas" and "equipment leasing". Appendix, Vol. I, p. 118. According to the defendants' calculations derived from Jason Kravetz's tax returns, between 1985 and 1988, Jason Kravetz sold nearly $2,500,000 in stocks and securities. *See* Appendix, Vol. II,

---

**4.** The Honeytree offering memorandum states only that "[t]he purchase of units involves certain risks ...." Appendix, Vol. I, p. 4.

pp. 222–230; Defendant's Memorandum in Support of Summary Judgment, p. 6. Since 1980, Jason Kravetz has owned a condominium on Clarendon Street in Boston, a condominium on Park Street in Boston, four condominiums in Florida, one condominium in Marlboro, Massachusetts and one condominium in "Governor's Park." Appendix, Vol. II, Deposition. of Jason Kravetz, pp. 160–69. In 1987, Jason Kravetz submitted a proposal to former Mayor Flynn for a "Sports and Entertainment Complex" which could replace the Boston Garden. *See* Appendix, Vol. II, pp. 369–405. In 1989, Jason Kravetz sponsored a $600,000 private placement for Boca Boston Enterprises, Inc. *Id.* at pp. 246, 263.

## III. Analysis

A. *Defendants' Request for Dismissal As a Sanction For the Kravetzes Alleged Perjury Is Being Denied.*

 In their reply memorandum in support of their motion for summary judgment, the defendants claim that "[b]ecause [the plaintiffs' conduct] establishes that this case is frivolous, that the plaintiffs were never able to support the claims that they made, and that the plaintiffs have knowingly and intentionally perjured themselves, dismissal is the appropriate sanction." Defendants' Reply Memorandum, pp. 5–6. In support of this position, defendants cite *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115 (1st Cir.1989), a case in which the Court of Appeals for the First Circuit upheld a district court's dismissal of a complaint on the basis that the plaintiff had perpetrated a fraud on the court. In *Aoude*, the court explained:

A "fraud on the court" occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

*Id.* at 1118.

In the present case, the defendants contend that the Kravetzes have committed a fraud on the court by filing affidavits containing representations which are allegedly inconsistent with their previous deposition testimony and by misrepresenting the nature of their financial sophistication and experience. The defendants' charge of fraud is not frivolous. The court is disturbed by the Kravetzes' "fluid" memory of various events.[5] The court also finds that the Kravetzes have mischaracterized their own investment expertise and experience.

Nevertheless, the defendants have not demonstrated, "clearly and convincingly", that the Kravetzes have committed perjury, fabricated evidence, or perpetrated some other "unconscionable scheme" which is generally associated with a finding of fraud on the court. *Id.* *See, e.g., Wyle v. R.J. Reynolds Industries, Inc.,* 709 F.2d 585, 589 (9th Cir. 1983) (upholding district court decision to dismiss suit when plaintiffs knowingly gave false sworn testimony and filed false sworn answers to interrogatories); *Aoude,* 892 F.2d at 1118–19 (finding a fraud on the court when plaintiff annexed a fabricated purchase agreement to his complaint). While the court finds that the Kravetzes have not fully and candidly presented certain facts, as the

---

5. For example, the Kravetzes allege in their Amended Complaint specific statements made by Lewinstein and Wilchins prior to each investment. *See* Amended Complaint, ¶¶ 33, 40, 47, 54, 61, 68, 75, 82, 89, 96. In their depositions, however, the Kravetzes could not recall any specific statements made by the defendants except that the investments were "good", "excellent", or "good for [them]." Appendix, Vol. II, Deposition of Jason Kravetz, pp. 24–25; Appendix, Vol. II, Deposition of Allan Kravetz, p. 74. After their depositions, the Kravetzes submitted affidavits in opposition to the motion for summary judgment which, with an exactness wholly absent from their deposition testimony, recited specific mis-

representations allegedly made prior to each investment. *See supra,* pp. 1298–1299. Similarly, in his deposition, Allan Kravetz testifies that, by the end of 1988, he was displeased with his investments: "I couldn't sell it: I couldn't get my money back. It had no value." Appendix, Vol. II, p. 101. This testimony erodes the Kravetzes' claim that they did not learn of their claims until March 1989. After consultation with counsel, *id* at 102, Allan Kravetz later testified: "I'd like to make a correction because it was in 1989. And that's when I first started becoming unhappy with this operation, not '88 as I said." *Id.* at 118.

Court of Appeals for the First Circuit has emphasized, dismissal of a suit on the basis of a fraud on the court allegation is "an extreme remedy, and should not lightly be engaged." *Aoude*, 892 F.2d at 1118. The court concludes that dismissal is not the appropriate response to the presentation of the Kravetzes' case. Accordingly, it is necessary to address the merits of defendants' motion for summary judgment.

### B. *Summary Judgment Standard*

Fed.R.Civ.P. 56(c) provides, in pertinent part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In determining the merits of a motion for summary judgment, the court should undertake two inquiries: (1) whether the factual disputes are genuine, and (2) whether any fact genuinely in dispute is material. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." *Id.* As to whether a dispute about a material fact is "genuine", the court must determine whether "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). At all times in making this assessment, "the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party." *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir. 1983).

### C. *The Plaintiffs' Deceit and Breach of Fiduciary Duty Claims Are Time–Barred.*

■ As the parties recognize,[6] the plaintiffs' claims for fraud and breach of fiduciary duty are governed by a three-year statute of limitations. *Howell v. Birnberg*, Mass.Super.Ct., 1994 WL 879659, *2 (1994) (three-year statute of limitations for fraud); *SFC Valve Corp. v. Wright Machine Corp.*, Mass.Super.Ct., 1994 WL 879739, *1 (1994) (same); *Demoulas v. Demoulas Super Markets, Inc.*, Mass.Super.Ct., 1995 WL 476772, *4 (1995) (three-year statute of limitations for breach of fiduciary duty); *Crowley v. Polar Corp.*, Mass.Super.Ct., 1994 WL 879357, *2 (1994) (same). Since only one of the plaintiffs' ten investments was made within three years of the filing of the original complaint in this action, plaintiffs are compelled to rely on principles of equitable tolling in an effort to bring their remaining investments within the three-year statute of limitations. Specifically, the plaintiffs claim that, as a result of the defendants' acts of fraudulent concealment, the plaintiffs did not discover their claims until March 1989, when they received oral warnings about the tax consequences of the investments from Allan Kravetz's business partner, Sidney Boyanski. Aff. of Allan Kravetz, ¶ 26; Aff. of Jason Kravetz, ¶ 23. The defendants contend, in response, that the Kravetzes were placed on notice of their claims when they received the offering memoranda which contained language contradicting the oral representations allegedly made by the defendants concerning the suitability of the limited partnership investments. As set forth below, the defendants' contention is correct. Accordingly, the plaintiffs' fraud and breach of fiduciary duty claims, except as they relate to the Groton investment, are time-barred.

### 1. The Discovery Rule and the Doctrine of Fraudulent Concealment

■ In Massachusetts, a plaintiff can prove that the running of the statute of limitations has been tolled by invoking one of two interrelated doctrines: (1) the "discovery rule;" and (2) the doctrine of fraudulent concealment. In interpreting Massachusetts law

---

6. *See* Defendants' Memorandum in Support of Summary Judgment, p. 11; Plaintiffs' Memorandum in Opposition to Summary Judgment, p. 20.

concerning the "discovery rule," the Court of Appeals for the First Circuit has explained that:

> Under this rule, the action accrues when the injured party knew or, in the exercise of reasonable diligence, should have known, the factual basis for the cause of action. [Citation omitted]. The standard set forth is an objective one. The action accrues when the injured party "reasonably should have known the factual basis for the cause of the action." In order for the statute of limitations to be tolled pursuant to the discovery rule, the factual basis for the cause of action must have been "inherently unknowable" at the time of the injury. [Citations omitted].

*Tagliente v. Himmer,* 949 F.2d 1, 4 (1st Cir.1991).

The doctrine of fraudulent concealment has been codified under M.G.L. ch. 260 § 12, which states:

> If a person liable to a personal action fraudulently conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

Under the doctrine of fraudulent concealment, "the statute of limitations may be tolled under G.L. c. 260 § 12, if the wrongdoer either concealed the existence of a cause of action through some affirmative action done with intent to deceive *or* breached a fiduciary duty of full disclosure." *Puritan Medical Center v. Cashman,* 413 Mass. 167, 175, 596 N.E.2d 1004 (1992) (emphasis added) (quoting *Frank Cooke, Inc. v. Hurwitz,* 10 Mass.App.Ct. 99, 108, 406 N.E.2d 678 (1980)).

## 2. Equitable Tolling in the Context of Securities Actions

The Court of Appeals for the First Circuit has frequently confronted the issue of equitable tolling in the context of federal securities fraud actions. In *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123 (1st Cir.1987), the court discussed the basic principles of equitable tolling as they apply to this case:

> "Storm warnings" of the possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner, [citation omitted], and his cause of action is deemed to accrue on the date when he should have discovered the alleged fraud. [Citation omitted]. We have recently emphasized, moreover, that whether a plaintiff should have discovered the fraud "is an objective question" requiring the court to "determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud." [Citation omitted]. In contrast, the determination of whether a plaintiff actually exercised reasonable diligence requires a more subjective inquiry focusing upon the circumstances of the particular case, including the existence of a fiduciary relationship, the nature of the fraud alleged, the opportunity to discover the fraud, and the subsequent actions of the defendants.

*Id.* at 128. In *Sleeper v. Kidder, Peabody & Co., Inc.* 480 F.Supp. 1264 (D.Mass.1979) *aff'd mem.,* 627 F.2d 1088 (1st Cir.1980), the court explained that "[t]he rule thus has two components. It begins with the ordinary investor—the standard against which we test whether sufficient facts were available at the time to trigger inquiry notice. Once on notice, the investor is then under a duty to exercise due diligence in making a further investigation into those facts." *Id.* at 1269.[7]

---

**7.** The principles of equitable tolling enunciated in the context of federal law in cases such as *Maggio* and *Sleeper* also apply to the state law claims made in the present case. For example, in *Maggio,* the plaintiff had alleged state law claims of fraud and breach of fiduciary duty in addition to federal claims under § 10(b) of the Securities Exchange Act of 1934. In dismissing the state law claims as time-barred, the court specifically referred to its earlier § 10(b) analysis, noting that: "The Massachusetts discovery rule, like the federal tolling doctrine, requires us to apply the 'reasonable diligence' standard to the facts admitted by plaintiff." *Maggio,* 824 F.2d at 130. Similarly, in *Sleeper,* the court applied the same statute of limitations "storm warnings" analysis to both the federal claim under § 10(b) and the related state law claims. The court noted that, "[i]n operation, the state law is identical to, if not more stringent than, the federal law we have applied to the facts of this case." *Sleeper,* 480 F.Supp. at 1270.

**1304**

In *Kennedy v. Josephthal & Company, Inc.*, 814 F.2d 798 (1st Cir.1987), the Court of Appeals for the First Circuit confronted circumstances similar to the facts of the present case. In *Kennedy*, the plaintiffs purchased limited partnership interests in what was characterized as a coal-mining enterprise. The enterprise fared poorly and the investors sued their broker for damages. *Id.* at 800. The investors alleged that their broker fraudulently induced them to purchase the limited partnership interests through various misrepresentations, including a reassurance that the investment was "safe". *Id.* at 801. The district court held that the plaintiffs' claims were time-barred.

· In affirming the district court's rulings, the Court of Appeals in *Kennedy* focused on the offering memorandum which was "provided" to the plaintiffs. *Id.* According to the court, the offering memorandum was "replete with warnings" about the investment. *Id.* For example, the memorandum stated that "[i]nvestment in the partnership involves a high degree of risk ... Each prospective investor should carefully consider the risk factors attendant to the purchase of the units...." *Id.* The court held that "the great glowering clouds of the offering memorandum" defeated appellants' efforts to bring their claims within the statute of limitations. *Id.* at 802. First, the court concluded that the "[a]ppellants were ... on inquiry notice [of the possibility of fraud] from the time they received the prospectus and spoke with [their broker] prior to the December 1979 closing. The notice appellants were on triggered the duty to exercise reasonable diligence." *Id.* at 802–03. The court then concluded that the plaintiffs would have discovered the fraud if they had exercised the required reasonable diligence. More specifically, the court stated that:

> The opportunity to discover the misleading nature of the statements could not have presented itself more readily than it did. For each oral representation that [the broker] made and upon which the appellants claim they relied, there was a direct refutation by the plain language of the offering memorandum. Both [the broker's] statements and the offering memorandum's assertions could not be true at the same

time. Logically, one statement or the other must have been false. Any attempt to resolve these contradictions should have uncovered the fraud or, at a minimum, dissuaded appellants from this folly ... Normally, the exercise of reasonable diligence would be a question of fact and not amenable to summary disposition ... Here, however, it can be said that as a matter of law, the exercise of reasonable diligence would require more of appellants than merely viewing two sets of statements, one of which logically cannot be true, and choosing one of those sets.

*Id.* at 803.

In the present case, the plaintiffs do not dispute the defendants' contention that the offering memoranda which the plaintiffs received in connection with the limited partnership investments contained language which was sharply inconsistent with the defendants' alleged oral representations concerning the suitability of the investments. They argue, however, that they should not be charged with knowledge of the offering memoranda because they did not read any of the investment materials which were sent to them. In other words, the plaintiffs claim that they had no actual knowledge of the "storm warnings" contained in the offering memoranda.

■ Plaintiffs' contention that they did not read the offering memoranda is directly inconsistent with representations which they made in several signed subscription agreements. Nevertheless, plaintiffs contend that they did not read the subscription agreements which they signed. *See* Aff. of Allan Kravetz ¶ 20; Aff. of Jason Kravetz ¶ 19. Under Massachusetts law, however, an individual who signs a document is charged with knowledge of what it says. *See Spritz v. Lishner*, 355 Mass. 162, 164, 243 N.E.2d 163 (1969) (" 'The general rule is that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not.' "); *Tiffany v. Sturbridge Camping Club, Inc.*, 32 Mass. App.Ct. 173, 175 n. 5, 587 N.E.2d 238 (1992) (same). The "fraud" referred to in *Spritz* is a fraudulent misrepresentation of the nature of the document. *See, e.g. Barrett v. Conra-*

*gan,* 302 Mass. 33, 34, 18 N.E.2d 369 (1938) (plaintiff can avoid contents of signed release not on the "mere fact[ ] that [she] had not read the contents of [the release]," but on the fact that she was told that the release was an address card). There is no such claim in this case. In any event, for the purposes of summary judgment, the court assumes that the ultimate question of whether the Kravetzes read the relevant offering memoranda is genuinely disputed. As discussed below, however, this factual dispute is immaterial to the resolution of the equitable tolling issues in this case.

Plaintiffs' attempt to evade the legal consequences of the offering memoranda, by pleading ignorance of their contents, runs counter to a substantial body of caselaw which holds that an investor is charged with knowledge of offering material even if the investor fails to read such material. For example, in *Dodds v. Cigna Securities,* 12 F.3d 346 (2nd Cir.1993), the plaintiff invested in certain limited partnerships. *Id.* at 347. Dodds had received the relevant prospectuses with "high risk" warnings, "but had not read the prospectuses because 'they looked like greek'...." *Id.* at 348. In its "storm warnings" analysis, the court dismissed her complaint, charging her with knowledge of the prospectuses, and stating that "a failure to read the prospectuses is not excused because of the documents' length." *Id.* at 351.

The common practice of imputing knowledge of the contents of offering materials to investors is typically manifested in two contexts: (1) when a court is determining statute of limitations questions; and (2) when a court is determining whether an investor has "justifiably relied" upon an alleged misrepresentation. *See, e.g., Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1517 (10th Cir.1983) ("Knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who failed to read such documents."); *DeBruyne v. Equitable Life Assurance Society of the United States,* 920 F.2d 457, 466 n. 18 (7th Cir.1990) ("[P]laintiffs cannot avoid the statute of limitations by possessing, but failing to read, the documents that would put them on inquiry notice.");

*Koke v. Stifel, Nicolaus & Co., Inc.,* 620 F.2d 1340, 1344 (8th Cir.1980) (dismissing claims of inexperienced investor as time-barred on the basis of her receipt of investment materials despite the fact that she did not "understand" them or "examine them carefully"); *Myers v. Finkle,* 950 F.2d 165, 167 (4th Cir.1991) (dismissing as time-barred claims of plaintiffs who failed to "study" the relevant investment materials, noting that "knowledge of information should be imputed to investors who fail to exercise caution when they have in their possession documents apprising them of the risks attendant to the investments."); *see also, Marks v. CDW Computer Centers, Inc.,* 901 F.Supp. 1302, 1316 (N.D.Ill.1995) (holding that a plaintiff has an affirmative duty to investigate when he "has materials in his possession, even if he chose not to read them, that would have put a reasonable person on inquiry notice of securities fraud."); *Marlow v. Gold,* 1991 WL 107268, *9 (S.D.N.Y.1991) (plaintiff cannot avoid statute of limitations by alluding to "an assurance from his accountant that the accountant would read the relevant materials.... [because a] reasonable investor would have read the [private placement memorandum]."); *Parkhurst v. North American Financial Services,* 919 F.Supp. 270, 274 (E.D.Mich.1996) (referring to "ample case law" which "stand[s] for the proposition that an investor who receives written offering materials containing full and objective disclosures and who declines to read these documents, relying instead upon the general assurances of the defendant, does so at his peril."); *Rankow v. First Chicago Corporation,* 678 F.Supp. 202, 205 (N.D.Ill.1988) *rev'd on other grounds,* 870 F.2d 356 (7th Cir.1989) ("Knowledge of material contained in a prospectus is imputed to investors, even if they have not read such a document."); *Davidson v. Wilson,* 763 F.Supp. 1465, 1467 (D.Minn. 1990) (same); *Bull v. Chandler,* 1992 WL 103686, *3–5 (N.D.Cal.1992) (same); *Calvi v. Prudential Securities, Inc.,* 861 F.Supp. 69, 70–72 (C.D.Cal.1994) (same); *but see, Luksch v. Latham,* 675 F.Supp. 1198, 1204 (N.D.Cal. 1987) (holding that the "mere receipt of a prospectus containing information that contradicts material representations made orally to investors, standing alone, does not put

such investors on constructive notice of section 10(b) and rule 10b–5 claims as a matter of law.").

It appears that the Court of Appeals for the First Circuit has not expressly decided the question of whether investors should be charged with knowledge of offering materials which are provided to them. A recent decision by the Court of Appeals for the First Circuit, however, suggests that proof that the plaintiff-investors have actually read the investment materials is not a prerequisite to the triggering of the duty to exercise reasonable diligence in investigating potential claims. In *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245 (1st Cir.1996), the trustee and participants in an ERISA qualified pension and profit sharing plan brought an action against its brokers for breach of fiduciary duty and fraud. The plaintiffs alleged that the defendants misrepresented the nature of three limited partnership interests which the plaintiffs had purchased. Pursuant to a "storm warnings" analysis, the Court of Appeals dismissed the plaintiffs' claims as time-barred because the relevant "prospectuses fully disclosed the suitability requirements and risk factors, and when read with reasonable diligence, plainly contradict the alleged oral misrepresentations that these were low-risk investments." *Id.* at 1256. The plaintiffs in *J. Geils* argued that dismissal of their claims was not appropriate because there was an alleged "factual dispute as to whether they ever received the prospectuses." *Id.* The court ultimately found that "the only reasonable inference a factfinder could reasonably draw is that [the plaintiffs] received the prospectuses for the limited partnerships on or around the time when the transactions were made." *Id.* at 1257. Of particular relevance to the present suit, however, the court did not allude to the question of whether any of the plaintiffs had actually *read* the relevant documents. Since the plaintiffs were claiming that they had never *received* the prospectuses, they were implicitly asserting that they had never *read* the prospectuses.

Nevertheless, the Court of Appeals for the First Circuit found the plaintiffs' claims to be time-barred.

The Court of Appeals for the First Circuit's "storm warnings" analysis in *J. Geils* is, therefore, consistent with its focus in *Kennedy* on the plaintiffs' receipt of the offering memoranda, as opposed to the plaintiffs' actual knowledge of the contents of the offering memoranda. *See, e.g., Kennedy*, 814 F.2d at 802 ("Appellants were, therefore, on inquiry notice from the time they *received* the prospectus and spoke with [the broker] prior to the December 1979 closing." (emphasis added)); *Id.* at 803 ("Appellants were placed on inquiry notice at the time they had the *opportunity* to examine the offering memorandum in light of [the defendant's] representations." (emphasis added)).[8]

In their memorandum, and at oral argument, plaintiffs make three arguments in an effort to distinguish the present case from the line of cases imputing knowledge of offering memoranda to the investor. First, the plaintiffs argue that the present case is distinguishable because the defendants in this case allegedly owed the Kravetzes a fiduciary duty. Even assuming, without finding, that the defendants owed a fiduciary duty to the Kravetzes, however, the plaintiffs misconstrue the nature of the First Circuit's "storm warnings" analysis. As the Court of Appeals for the First Circuit explained in the above-quoted passage from *Maggio*, the existence of a fiduciary relationship may be relevant to the question of whether a plaintiff actually exercised reasonable diligence upon receiving certain "storm warnings". However, the existence of a fiduciary relationship has no bearing on the question of whether the Kravetzes should be charged with knowledge of certain "storm warnings" in the first place—an inquiry that is judged by an "objective" standard. *Maggio*, 824 F.2d at 128. The focus is on whether "sufficient facts were available to put a *reasonable* investor in plaintiff's position on inquiry notice of the possibility of fraud." *Id.* (emphasis added).

---

**8.** In *Kennedy*, the court did not indicate whether the plaintiff-investors had *actually* read the relevant materials. However, as is true with some investments in the present case, the plaintiffs

"executed documents *stating* that they had read the offering memoranda." *Kennedy*, 814 F.2d at 801 (emphasis added).

The district court in *Sleeper*, a decision affirmed by the Court of Appeals for the First Circuit, explained the proper use of objective and subjective standards in an equitable tolling analysis:

> As to the first issue, when inquiry notice is triggered, [the plaintiff's] level of sophistication is irrelevant. Even if plaintiff here could succeed in carrying his burden of proving no actual notice (which is unlikely in light of his handwritten notes, his testimony, and the ample disclosures of the defendants), any ordinary investor, on the evidence available to him, would have been put on inquiry notice long before March 21, 1973, the outermost date if this action is to be considered timely. Once on inquiry notice, however, the duty to exercise reasonable diligence in uncovering the fraud may turn in part on the sophistication of the buyer. "The duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication in the financial community, and knowledge of related proceedings."

*Sleeper*, 480 F.Supp. at 1269 (quoting *Tobacco & Allied Stocks v. Transamerica Corp.*, 143 F.Supp. 323, 331 (D.Del.1956) *aff'd* 244 F.2d 902 (1957)).

Plaintiffs cite no authority for the proposition that the existence of a fiduciary relationship alters the analysis of "when inquiry notice is triggered." *Id.* Indeed, in the foregoing cases which impute knowledge of offering memoranda to the investor, the courts were frequently faced with claims of breach of fiduciary duty. Notably, these claims were not factors in the courts' analyses of the inquiry notice issue. In *Dodds*, for

example, the plaintiff was a forty-five-year-old widow with a tenth-grade education and "no involvement in the family's financial affairs or investment decisions other than receiving an allowance for maintaining the household." *Dodds*, 12 F.3d at 347–48. As in the present case, Dodds hired an "investment advisor" (and not merely a "broker") to perform investment services, *see Dodds v. Cigna Securities, Inc.*, 841 F.Supp. 89, 90 (W.D.N.Y.1992), and claimed, *inter alia*, a breach of fiduciary duty. Despite the plaintiff's apparent lack of financial sophistication, and despite her claim of breach of fiduciary duty, the court charged her with knowledge of the relevant prospectuses without discussing these subjective factors.

Similarly, in *Myers*, the plaintiffs' accountant induced the plaintiffs to purchase limited partnership interests. The Court of Appeals for the Fourth Circuit expressly overturned the district court's ruling that the accountant did not owe a fiduciary duty to the plaintiffs in offering them investment advice, and held that a genuine issue of material fact existed on this question. *Myers*, 950 F.2d at 168. This holding, however, was not mentioned in the court's decision to impute knowledge of the relevant offering memoranda to the plaintiffs. *Id.* at 167; *see also DeBruyne*, 920 F.2d at 465–66 (ERISA plan participants charged with knowledge of investment document despite alleging breach of fiduciary duty against investment managers of plan funds); *Marlow*, 1991 WL 107268 at *1 (plaintiff charged with knowledge of offering memoranda despite alleging breach of fiduciary duty against his own tax accountant who recommended investment); *Bull*, 1992 WL 103686 at *3–5 (claim of breach of fiduciary duty not mentioned in court's decision to impute knowledge of investment materials to investor); *Calvi*, 861 F.Supp. at 70–72 (same).[9]

---

**9.** To the extent that the plaintiffs argue that they, in fact, exercised reasonable diligence upon receiving inquiry notice of their claims from the offering memoranda, their argument is unavailing. While it is true that the "reasonable diligence" question involves an analysis of certain subjective factors mentioned in *Sleeper* and *Maggio*, it is clear, as a matter of law, that the Kravetzes did not exercise the requisite reasonable diligence in investigating the "storm warnings" in the offering memoranda. The Court of

Appeals for the First Circuit's decision in *J. Geils* is controlling. In *J. Geils*, appellants argued that "they acted in a reasonably diligent manner in light of their unsophistication as investors and their reliance on Appellees as their fiduciaries." *J. Geils*, 76 F.3d at 1259. The court rejected this argument, explaining that:

> [A]lthough subjective factors are taken into account, "the exercise of reasonable diligence requires an investor to be reasonably cognizant

■ The consistent refusal of federal courts to inject subjective factors into the question of whether investors should be charged with knowledge of important investment documents rests on sound public policy considerations. An investor's lack of financial sophistication,[10] or blind reliance upon an investment advisor's advice, should not relieve the investor of his common sense obligation to review investment materials which are created pursuant to federal mandate and which are provided to him. Such materials are required by various statutes to provide investors with the accurate information necessary to make properly informed investment decisions. It would be anomalous and inappropriate for the courts to undermine the efficacy of those statutes by allowing investors, such as the Kravetzes, to gain an advantage in litigation if they ignore the materials the law requires be prepared for their consideration before an investment decision is made. As the Court of Appeals for the Tenth Circuit noted in *Zobrist*: "While [the court is] not certain that this result would encourage investors to throw caution and prospectuses to the wind, [it] see[s] no reason to reward investors who do so." *Zobrist*, 708 F.2d at 1518.

■ The Kravetzes' second argument in support of their attempt to distinguish the present case from the line of cases imputing knowledge of investment materials to investors is that, in the present case, the existence of the Investment Advisory Agreements fundamentally altered the nature of the relationship between them and the defendants. This argument is not persuasive. Despite their persistent references to the Agreements, the plaintiffs fail to explain how or why they affect the relevant analysis. The Agreements authorized the defendants to perform certain advisory services for the plaintiffs for an annual fee. None of the provisions in the Agreements either expressly or implicitly relieved the plaintiffs of their obligation to familiarize themselves with their possible investments or read investment materials which were sent to them. The Agreements do not mention offering memoranda or prospectuses. Nor do they mention the duties of the client. Furthermore, as described earlier, even if the Agreements offered the Kravetzes some form of reassurance as to the reliability of their investment advisors, this subjective expectation is not relevant to the question of when inquiry notice is triggered. To the extent that it is relevant to the question of whether the Kravetzes exercised "reasonable diligence," it is clear that the Kravetzes exercised no diligence at all. *See* supra, n. 9. Therefore, the Kravetzes can derive no benefit from either the text or their subjective interpretations of the Agreements.

■ Finally, the Kravetzes claim that their receipt of the offering memoranda did not trigger the running of the three-year

---

of financial developments relating to [their] investment, and mandates that early steps be taken to appraise those facts which come to the investor's attention." [Citation omitted]. Even assuming that Appellees owed Appellants a fiduciary duty, an investor "must 'apply his common sense to the facts that are given to him [or her]' in determining whether further investigation is needed." [Citation omitted] ... As to the opportunity to discover the misleading nature of [the broker's] representations and the monthly statements, it could not have presented itself more readily. The misleading information was directly refuted by the plain text of the prospectuses and simple arithmetic of the numbers on the monthly statements. Both [the broker's] representations about the limited partnerships and the prospectuses' risk disclosures could not be true. Logically, one or the other must have been false .... A minimal attempt to resolve these contradictions ... should have uncovered the fraud or, at a mini-

mum, prompted Appellants to abandon ... their "laissez-faire" approach.
*Id.* at 1259–60. In the present case, as in *J. Geils*, the amount of investigation required by the plaintiffs to uncover the nature of the alleged fraud was minimal. Upon receiving the offering memoranda, their cause of action was, in effect, at their fingertips. Despite this fact, the Kravetzes failed to conduct even a basic investigation into the circumstances surrounding their investments. As a matter of law, their inaction demonstrates that they did not exercise reasonable diligence. *Id; Kennedy*, 814 F.2d at 803 (finding a lack of reasonable diligence "as a matter of law").

10. This is not to suggest that the Kravetzes were financially unsophisticated. Despite their categorical representations of naivete and inexperience, it is clear from the record that the Kravetzes were sophisticated businessmen with considerable investment experience.

statute of limitations because the defendants fraudulently concealed the plaintiffs' causes of action. More specifically, the plaintiffs argue that, as a result of the alleged fiduciary relationship between the Kravetzes and their investment advisors, the defendants owed the Kravetzes an affirmative duty of disclosure. According to the Kravetzes, the defendants breached this duty.

Under Massachusetts law, where "a fiduciary relationship exists between plaintiff and defendant ... [a] mere failure to reveal information may be sufficient to constitute fraudulent conduct for the purposes of [M.G.L. c. 260 §] 12." *Maggio*, 824 F.2d at 130. However, even assuming, without deciding, that the defendants owed a fiduciary duty to the plaintiffs, the Kravetzes fail to raise a genuine issue of material fact with respect to this question of fraudulent concealment. The undisputed facts demonstrate that the defendants fully disclosed, in writing, and often in bold print, the risk factors associated with the plaintiffs' investments. These disclosures were made in offering memoranda and other documents which were routinely sent to the Kravetzes. The fact that the Kravetzes chose not to read these documents does not constitute fraudulent concealment on the part of the defendants. The plaintiffs cite no cases or authority which place an obligation on the defendants to cross-examine their clients as to whether they have actually read information which was provided to them. Rather, as the Court of Appeals for the Seventh Circuit has noted: "A seller who fully discloses all material information in writing should be secure in the knowledge that it has done what the law requires ... Otherwise even the most careful seller is at risk, for it is easy to claim: 'Despite what your written documents say, one of your agents told me something else.'" *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir.1988).

Similarly, the plaintiff in *Dodds* alleged that the defendants had fraudulently concealed the basis of her claims. In language which is also applicable to the present case, the Court of Appeals for the Second Circuit rejected her argument, stating:

There is no allegation that defendants prevented or discouraged [the plaintiff] from reviewing the prospectuses that were provided to her several weeks before she invested in the limited partnerships. Because receipt of the prospectuses alone put [plaintiff] on constructive notice of her claims, the allegations in question do not amount to fraudulent concealment.

*Dodds*, 12 F.3d at 352.

In essence, as a result of numerous offering documents that they received during the years 1984–88, which specifically contradicted the oral representations allegedly made by the defendants, the Kravetzes were placed on inquiry notice of their claims long before February 14, 1989. Having inquiry notice, the Kravetzes failed to exercise reasonable diligence in investigating the nature of their claims. Accordingly, there is no basis for their claim of equitable tolling. Therefore, the defendants' motion for summary judgment on plaintiffs' claims of deceit and breach of fiduciary duty (Counts IV and V) is being allowed.

D. *The Plaintiffs' Breach of Contract Claim Is Time–Barred As It Relates to Pre–February 14, 1986 Investments, Including the Clinton, Old Mews, and Honeytree Investments.*

■ In Count I of the Amended Complaint, plaintiffs claim that the defendants breached their contractual obligations under the Agreements. In their submissions, the plaintiffs narrow the focus of this alleged breach to Paragraph (1)(a) of the Agreements.

As discussed earlier, in the first version of the Agreement, Paragraph (1)(a) provided that "USTIA will perform the following services for the Client: (a) Seek out, research and evaluate, and recommend for purchase, investment opportunities which it deems appropriate for the Client's needs and objectives in the areas of real estate, oil and gas, equipment leasing, research and development, cable television and other areas of interest." In the second version of the Agreement, Paragraph (1)(a) was edited slightly to provide: "USTIA will perform the following services for the Client: (a) Seek

out, evaluate, and recommend for purchase, real estate and other investment opportunities which it deems appropriate for Client's needs and objectives."

While the parties dispute the appropriate statute of limitations for the plaintiffs' breach of contract claim, they agree that the maximum statute of limitations for this claim is the six-year statute of limitations for contract actions. *See* M.G.L. ch. 260 § 2. As such, the plaintiffs' breach of contract claim concerning the Clinton, Old Mews, and Honeytree investments is time-barred. The Clinton, Old Mews, and Honeytree investments were made prior to February 14, 1986 and, therefore, fall outside of the six-year limitations period. For the reasons explained previously, there is no basis for equitably tolling any part of this six-year period. More specifically, by virtue of the offering memoranda received by the Kravetzes in connection with the Clinton, Old Mews, and Honeytree investments, they were placed on inquiry notice by 1985 of potential breach of contract claims relating to them. Upon receiving inquiry notice, the Kravetzes did not exercise the required reasonable diligence in investigating their possible breach of contract claims. Therefore, the Kravetzes are not entitled to the benefit of equitable tolling with respect to Count I of their Amended Complaint.

The defendants contend, however, that what the plaintiffs' denominate as a breach of contract claim should be governed by the three-year statute of limitations for torts. *See* M.G.L. ch. 260 § 2A. The defendants claim that the Agreements only obligated the defendants to exercise that degree of due care which is required by other members of their profession. Therefore, according to the defendants, the plaintiffs' breach of contract claim is, in essence, a tort-based, failure-to-exercise-due-care claim. The defendants also argue that the "gist" of Count I of the Amended Complaint is a claim for tort damages. For the reasons stated below, the defendants' attempt to reduce the statute of limitations by converting Count I into a "tort" claim is not persuasive.

In Massachusetts, "[t]he essential nature of the right asserted determines the appro-

priate statute of limitations." *Micera v. Neworld Bank,* 412 Mass. 728, 731, 592 N.E.2d 1294 (1992). In other words, courts frequently look to the "'gist of the action'" in deciding which statute of limitations to apply to a particular claim. *Hendrickson v. Sears,* 365 Mass. 83, 85, 310 N.E.2d 131 (1974). For example, "[a] plaintiff may not … escape the consequences of a statute of repose or statute of limitations on tort actions merely by labelling the claim as contractual." *Anthony's Pier Four, Inc, v. Crandall Dry Dock Engineers, Inc.,* 396 Mass. 818, 823, 489 N.E.2d 172 (1986).

In general, however, "tort obligations do not arise solely from contract, but instead are imposed by law, independent of the promises and therefore apart from the intentions of the parties. [Citation omitted]. Therefore, if the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent, then contract law should be the only theory upon which liability would be imposed.'" *Treadwell v. John Hancock Mutual Life Insurance Co.,* 666 F.Supp. 278, 289 (D.Mass. 1987) (quoting W. Prosser & W. Keeton, *Torts* § 92 at 655–56 (5th ed. 1984)).

In explaining and employing the foregoing principles, the Supreme Judicial Court of Massachusetts has drawn a distinction between *implied* warranties where the only guarantee is to act with the amount of due care required under existing law and *express* warranties where the "defendant has promised a specific result." *Anthony's Pier Four,* 396 Mass. at 823, 489 N.E.2d 172. *See also Klein v. Catalano,* 386 Mass. 701, 719 n. 19, 437 N.E.2d 514 (1982) (holding that M.G.L. ch. 260 § 2B bars a breach of implied warranty claim where the elements for breach of implied warranty and for negligence claims are the same). Thus, in *Anthony's Pier Four,* the court applied a contract statute of limitations to an alleged breach of an oral agreement to build a mooring system which would adequately withstand expected wind and tidal conditions. The court stated: "This promise … imposes a higher duty on the defendants than the implied promise that in designing the mooring system they would 'exercise that standard of reasonable care

required of members of [their] profession.'" *Anthony's Pier Four*, 396 Mass. at 823, 489 N.E.2d 172, (quoting *Klein*, 386 Mass. at 719, 437 N.E.2d 514).

The Agreements entered into prior to 1987 plainly did more than express the defendants' common law duty to perform their functions with due care. Those agreements limited defendants' liability to circumstances involving "bad faith, gross negligence or reckless disregard of [their] obligations." Aff. of Allan Kravetz, Ex. A, ¶ 4; Aff. of Jason Kravetz, Ex. A, ¶ 4. Having prepared and obtained written agreements under which the Kravetzes gave up the right to recover for mere negligence that they would otherwise have had in a tort action, it is inappropriate—and in any event unavailing—for defendants to contend that they should nevertheless get the benefit of the three-year statute of limitations applicable to tort actions. Thus, the statute of limitations for the Agreements prior to 1987 is the six years provided for contract actions by M.G.L. ch. 260 § 2.

▮ Although the 1987 and 1988 Agreements do not contain the foregoing limitation of liability, the statute of limitations for them is six years as well. As in the earlier agreements, the defendants promised, in writing, to "seek out", "evaluate", and "recommend for purchase", investments which they "deemed appropriate for the Client's needs and objectives." This promise obligated the defendants to take certain affirmative actions for the Kravetzes. The plaintiffs' theory of the case, as stated in their

submissions and at oral argument, is not merely that the defendants performed the required services negligently. Rather, they are alleging, in part, that the promised services were not performed at all.[11] In other words, plaintiffs contend that the defendants were under a contractual obligation to seek and recommend for purchase investments which they believed were particularly suitable for the Kravetzes, who allegedly said they wanted investments which were "conservative" and "tax-free," but that the defendants deliberately did not make any efforts to identify such investments. Rather, the Kravetzes contend the defendants recommended investments which they knew were risky and unsuitable. The obligation to seek and recommend investments appropriate for the Kravetzes is rooted in the written Agreement, rather than merely being an expression of an obligation imposed by law.

The court recognizes that the defendants did not expressly warrant that they would only recommend for purchase investments which were *actually* suitable for the Kravetzes. The Agreements do, however, expressly state that the defendants would perform certain tasks with a view towards finding and recommending investments which they *deemed* appropriate. A failure to make that promised effort would constitute a breach of contract, not a tort. Thus, the six-year statute of limitations applies.[12]

In essence, the defendants offered, in writing, to perform certain tasks. The plaintiffs accepted the offer with their signatures and a

---

11. In their memorandum in opposition to summary judgment, the plaintiffs state that:

It turns out ... that USTIA's undertaking to "seek out" investments was a sham. In fact, USTIA only handled one product—real estate based limited partnerships. In the vast majority of cases, it did not "seek out" anything. Instead, USTIA's sister company already was being paid a fee by the general partner to "structure" the investment. Similarly, USTIA did not perform any "research" or do anything to "evaluate" the investments beyond what it already was doing for a fee for the general partner.

Plaintiffs' Memorandum in Opposition to Summary Judgment, p. 12.

12. Because the Agreements created obligations to seek, evaluate and recommend appropriate investments which would not otherwise exist, the

present case is distinguishable from those cases cited by the defendants in which a plaintiff hired a professional to perform a service, pursuant to an oral agreement, and subsequently claimed that the professional has breached an alleged implied warranty to perform services with reasonable care. See *Klein*, 386 Mass. at 719, 437 N.E.2d 514 (implied warranty claim against architect treated as a tort claim because architect only promised to "exercise that standard of reasonable care required of members of his profession."); *Light v. Roney*, 4 Mass.L.Rptr. No. 16, 346, 347 (Mass.Super.Ct.1995) (contract claim which was not grounded in written contract treated as a tort claim because the "gist" of action was one of "professional malpractice or professional negligence.").

payment of $5,000 per year. Having proposed a written agreement, the defendants now seek to avoid the traditional six-year statute of limitations for contract actions even though the plaintiffs have sued upon a specific provision of the Agreement, claiming, in part, non-performance. Having entered into a written agreement, the parties should, by virtue of M.G.L. ch. 260 § 2, have expected that the plaintiffs would have six years to sue for any alleged breach of it. There is no good reason for the court to alter this reasonable expectation in this case. Accordingly, there is a six-year statute of limitation on plaintiffs' breach of contract claims. Therefore, such claims concerning the investments made after February 14, 1986—Gratz Park, Braden Lakes, Forest Mortgage, Petron Mortgage, Chattanooga Properties, The Hamptons, and Groton—are not time-barred.

## IV. ORDER

In view of the foregoing, defendants' motion for summary judgment is hereby ALLOWED in part and DENIED in part, and it is hereby ORDERED that:

1. Count IV (deceit) and Count V (breach of fiduciary duty) of the Amended Complaint are DISMISSED except as they relate to the Groton investment.

2. Count I is DISMISSED as to the investments made before February 14, 1986—Clinton, Old Mews, and Honeytree.

3. In view of this decision, the parties shall confer and inform the court, by October 4, 1996, whether this case has been settled.

4. If the case is not settled, counsel and the parties shall appear on October 11, 1996 at 4:00 p.m., for a conference to address settlement and, if necessary, a schedule for the remainder of this case.